# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #059

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **6th day of December, 2017**, are as follows:

**PER CURIAM**:

2017-B -1290     IN RE: PEGGY M. HAIRSTON ROBINSON

Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Peggy M. Hairston Robinson, Louisiana Bar Roll number 1132, be and she hereby is permanently disbarred. Her name shall be stricken from the roll of attorneys and her license to practice law in the State of Louisiana shall be revoked. Pursuant to Supreme Court Rule XIX, § 24(A), it is further ordered that respondent be permanently prohibited from being readmitted to the practice of law in this state. It is further ordered that respondent make full restitution to each of her clients subject of the formal charges, or to the Louisiana State Bar Association's Client Assistance Fund, as applicable. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.

SUPREME COURT OF LOUISIANA

NO. 2017-B-1290

IN RE: PEGGY M. HAIRSTON ROBINSON

ATTORNEY DISCIPLINARY PROCEEDING

PER CURIAM

This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, Peggy M. Hairston Robinson, an attorney licensed to practice law in Louisiana but currently on interim suspension for threat of harm to the public. *In re: Robinson*, 15-0410 (La. 3/11/15), 162 So. 3d 1172.

**PROCEDURAL HISTORY**

In August 2015, the ODC filed formal charges against respondent. Respondent answered the formal charges. Prior to a formal hearing in the matter, respondent and the ODC filed a joint stipulation of facts. Thereafter, the hearing committee conducted a formal hearing on the merits over seven days in January and February 2016.

**UNDERLYING FACTS**

Respondent was a mortgage loan originator and mortgage broker, both individually and as a principal of Metropolitan Mutual Mortgages, Inc. ("MMM"), duly licensed by the Louisiana Office of Financial Institutions ("OFI"). After several of respondent's former loan customers filed complaints against her with the

OFI, her mortgage originator and mortgage broker licenses were revoked.[1] Respondent is also a real estate agent, both individually and as a principal of Satellite Realty and Associates, Inc., duly licensed by the Louisiana Real Estate Commission. The ODC alleges that respondent engaged in attorney misconduct as well as misconduct stemming from her roles as a mortgage loan originator, mortgage broker, and real estate agent.

*Count I – The Hicks Matter*

The following facts are not in dispute, having been stipulated to by the parties.

In August 2001, Anthony Hicks consulted with respondent through MMM to obtain a construction loan for a home to be located on Swingalong Avenue in Baton Rouge. Respondent was retained solely as a certified mortgage broker and was paid $2,605 for services in obtaining the loan, which closed in September 2001. Thereafter, Mr. Hicks returned to respondent to obtain permanent financing for the construction project. She secured an offer of financing from Bayrock Mortgage. Mr. Hicks was not agreeable to the terms and refused to close on the loan. Respondent then filed a loan application with BNC Mortgage.

Respondent claimed that Mr. Hicks owed her $6,812 and that $5,780 of that money was hers for "68 hours legal and preparation services on 2 properties." In June 2002, she filed a lien against the Swingalong Avenue property and against Mr. Hicks' personal residence. Mr. Hicks paid respondent $3,050 to have the liens canceled and the sale completed. In July 2002, Mr. Hicks filed a complaint with the OFI. Following its investigation, the OFI rejected respondent's claim that she provided legal services to Mr. Hicks and was, therefore, entitled to the fees.

---

[1] Darin Domingue of the OFI testified that respondent's licenses were revoked for overcharging and taking impermissible advance fees.

The ODC alleged respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 8.4(a) (violation of the Rules of Professional Conduct) and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

After considering the testimony and evidence presented at the hearing, the hearing committee made the following findings:

Mr. Hicks alleged to the OFI that respondent continued to work although she was asked to stop. Mr. Hicks also asserted he did not hire respondent for legal services. Following the OFI administrative hearing, the revocation of respondent's licenses was affirmed and she was ordered to return $3,050 to Mr. Hicks. It was also determined that respondent had overcharged Mr. Hicks for credit reports and improperly assessed or was paid other fees in advance of the loan closing. Respondent admitted that she has not paid Mr. Hicks.

Respondent testified that she performed legal services for Mr. Hicks, and, in her capacity as a lawyer, had a right to place the liens, claiming he owed her for legal services. She placed the liens without obtaining or executing a judgment, but relied on a document entitled "monthly billing statement," representing a compilation of receipts for legal work she performed for Mr. Hicks. The statement, which was not created until January 2003, purports to be for services from April 8, 1998 through June 13, 2002. Mr. Hicks testified that he did not receive the document, did not hire respondent for legal representation, and did not know she was an attorney until the closing.

The committee did not credit respondent's testimony, which changed during the hearing. Initially, respondent stated that she was acting only as a mortgage banker and later stated that she was entitled to money for legal fees. Rather, the committee credited Mr. Hicks' testimony, which was consistent with the opinions of the administrative law judge and the OFI order. The committee also questioned

3

whether the "monthly billing statement" was an accurate representation of prior services.

Based on these findings, the committee determined respondent violated Rules 8.4(a) and 8.4(c) of the Rules of Professional Conduct.

*Count II – The Irving Matter*

The following facts are not in dispute, having been stipulated to by the parties.

In March 2006, respondent filed a petition for damages against Steve Irving, the attorney who had represented Mr. Hicks (Count I). In the suit, captioned *Peggy M. H. Robinson v. Steve Irving*, No. 541,068 on the docket of the 19th Judicial District Court for the Parish of East Baton Rouge, respondent stated the following:

> From October 2002 until March 2005, the defendant filed a suit, which he knew to be without merits [sic] and filed two complaints with the Louisiana State Bar Association which he knew to be unwarranted. …
>
> On one occasion, out of malice, defendant made reference to petitioner's ability to think and function, due to her advanced age, all in an attempt to degrade and/or defame the petitioner and placed petitioner in a bad light before the Courts and the Louisiana State Bar Association. Such action was done with reckless disregard for any consequences, which might and could result from his wrongful actions.

Respondent filed the pleading with a motion and order to proceed *in forma pauperis*. The motion was denied in June 2006. Mr. Irving was not served until July 2009, approximately three years after the filing of the petition and after the dismissal of a mirrored complaint that was filed in federal court. After Mr. Irving answered the petition, no further action to prosecute this matter was taken by respondent.

The ODC alleged respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 3.1 (a lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous), 8.4(a), 8.4(d) (engaging in conduct prejudicial

4

to the administration of justice), and 8.4(g) (a lawyer shall not threaten to present criminal or disciplinary charges solely to obtain an advantage in a civil matter).

After considering the testimony and evidence presented at the hearing, the hearing committee made the following findings:

Mr. Irving testified that respondent unsuccessfully tried to sanction him in federal court and was cautioned about filing frivolous and fictitious pleadings. Respondent testified that she did not sue Mr. Irving; however, the ODC's exhibits contain copies of the petition that was filed in state court and pleadings from the federal court that show respondent as a plaintiff and Mr. Irving as a defendant. In the district court case and on appeal, respondent was adjudged to have filed frivolous pleadings. The ruling and order of the United States District Court for the Middle District of Louisiana provides:

> Plaintiffs' arguments are repetitious and vexatious. It is questionable whether the court retains jurisdiction over some of the arguments considering the numerous notices of appeals filed by plaintiffs. Additionally, plaintiffs attempt to interject matters that are not properly before the court. Moreover, the court agrees with defendants that plaintiffs' arguments are baseless.
>
> Accordingly, the motion for new trial is hereby DENIED. Plaintiff is hereby placed on notice that any further such motions shall result in plaintiffs being required to satisfy personally the excess costs, expenses and attorney's fees incurred by defendants because of such vexatious filings. ...
>
> The clerk's office shall not accept any additional filings from plaintiffs without having first obtained court approval. No additional filings will be accepted absent a showing of good cause.

This ruling was entered by Judge James J. Brady on December 9, 2008.

Similarly, in the United States Fifth Circuit Court of Appeals, a judgment dated January 5, 2010 provides in pertinent part as follows:

> IT IS ORDERED AND ADJUDGED that the appeal is dismissed as frivolous.

5

> IT IS FURTHER ORDERED that Plaintiffs-Appellants pay to Defendants-Appellees double costs on appeal to be taxed by the Clerk of this Court.
>
> IT IS FURTHER ORDERED that Plaintiffs-Appellants are ordered to pay Defendants-Appellees $10,000.00 in attorney fees.

The committee was provided no evidence to show that the $10,000 and double costs were ever paid. Respondent offered no evidence to refute this charge. Her defense was her conclusory testimony that Mr. Hicks had engaged in a pattern of interfering with her mortgage company's business. The court orders are clear.

Based on these findings, the committee determined respondent violated Rules 3.1 and 8.4(a) of the Rules of Professional Conduct.

### *Count III – The Arvie Matter*

The following facts are not in dispute, having been stipulated to by the parties.

Kenneth Arvie sought funding with MMM for a construction project. Respondent was retained solely as a certified mortgage broker. Mr. Arvie paid respondent $2,500 as a "deposit on project/commercial." When respondent failed to obtain final approval for the loan, Mr. Arvie demanded a refund. On September 6, 2002, respondent wrote to Mr. Arvie on "Attorney at Law" letterhead and claimed that she

> obtained permanent financing and issued a commitment, which is standard in the business for a fee, also directed you to a local Commercial bank for construction loan. Both the construction loan and the permanent (sic) loan was approved when you make the necessary corrections on your 1040 returns.

In response to Mr. Arvie's request for a refund, respondent stated that a return of the unused amount would be available in certified funds "on or before September 20, 2002."

6

Mr. Arvie filed a complaint against respondent with the OFI. On November 26, 2003, an administrative law judge ordered respondent to refund $1,375 to Mr. Arvie.

The ODC alleged respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.7 (conflict of interest), 1.8 (prohibited business transactions between a lawyer and client), 3.4(c) (knowing disobedience of an obligation under the rules of a tribunal), 8.4(a), and 8.4(c).

After considering the testimony and evidence presented at the hearing, the hearing committee made the following findings:

Mr. Arvie paid respondent $8,875, but she never secured the loan. Respondent testified that she did obtain approval for the loan and also claimed that Mr. Arvie asked her for a "legal plan" to go to the secondary market. Respondent admitted she did not give the $1,325 refund as ordered and testified she used the money to pay for an appraisal. Mr. Arvie testified that he never hired respondent for any legal work, never got the loan, and never received an appraisal. The committee credited the testimony of Mr. Arvie.

Based on these findings, the committee determined respondent violated Rules 3.4(c), 8.4(a), and 8.4(c) of the Rules of Professional Conduct.

*Count IV – The Rayford Matter*

In 1994, Robert Rayford and Joseph Wright filed suit *pro se* in federal court in Mississippi. In the suit, they made prisoner complaints concerning conditions of confinement. Mr. Rayford then hired respondent to represent him. In January 1996, she accompanied him to an evidentiary hearing, where there was discussion as to whether she would also represent Mr. Wright. Following the hearing, United States Magistrate Judge Eugene Bogen signed the following order:

7

> … [W]ithin 30 days of this date counsel for plaintiff
> Rayford shall notify the court in writing of her intention to
> also represent plaintiff Joseph Wright.

> … [T]his cause [shall] be held in abeyance for a period of
> 45 days, during which time plaintiffs' counsel shall
> investigate the matter and move to file an amended
> complaint which more narrowly focuses the issues, stating
> specifically what the plaintiffs are seeking in relief, and
> specifically what each defendant did or did not do which
> violated the constitutional rights of the plaintiffs.

On April 1, 1996, Mr. Rayford's case was again before the court, at which time Judge Bogen noted respondent's failure to file anything, despite his order. Judge Bogen then issued the following order in pertinent part:

> … Honorable Peggy M. Robinson shall within 10 days of
> this date notify the court in writing of her intention to
> proceed on Mr. Rayford's behalf, including an explanation
> of her failure to comply with the order dated January 22,
> 1996, or, if she does not intend to represent Mr. Rayford,
> counsel shall forthwith move to withdraw.

On April 22, 1996, in a letter to the deputy clerk, respondent stated:

> This letter is regarding the telephone conversation we had
> last week. I am forwarding a Motion to Enroll as Counsel
> of Record and Motion for Continuance with the correct
> case number. I will represent Mr. Rayford, Jr. in a timely
> and expedient manner...

In May 1996, Mr. Rayford's case was again before the court. In his order, Judge Bogen noted that respondent's motion to enroll was "not well taken and should be denied." As to her failure to comply with court orders, Judge Bogen stated: "Such disregard for the court will not be tolerated. Thus, the court hereby imposes sanctions upon Ms. Robinson for failing to comply with the court orders ... in the amount of $200." Respondent was given ten days to pay the sanction and the clerk of court was directed to strike her from the docket as counsel of record. To date, respondent has not paid the sanction.

In July 1996, the court dismissed the case without prejudice for failure to prosecute. Mr. Rayford filed a motion seeking a new court date, noting that his

8

counsel had been ineffective. His motion was treated as a motion to reconsider, which was denied in September 1996.

The ODC alleged respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.3 (failure to act with reasonable diligence and promptness in representing a client), 3.4(c), 8.4(a), and 8.4(d).

After considering the testimony and evidence presented at the hearing, the hearing committee made the following findings:

Respondent's testimony was so equivocal that the committee could not credit it. She first admitted that the sanction was not paid and stated that she would "send the $200." She then testified that she thought she had paid $100 after she came back to Louisiana. She then said, "I think I paid it." She acknowledged that the court denied her enrollment and ordered her to pay $200. This occurred in May 1996. Respondent said she would check on it and get it in the mail. Respondent testified that due to an emergency, she was out of town for four or five months and did not get the court notices. She testified that a Hammond attorney was supposed to cover for her but did not go to her office. She speculated that someone else got her mail but did not give it to the attorney. The court orders are clear and there is no reliable evidence to show that the $200 was paid. There is also concern that respondent offered to follow-up with the court and never indicated that she did so.

Based on these findings, the committee determined respondent violated Rules 1.3, 3.4(c), 8.4(a), and 8.4(d) of the Rules of Professional Conduct.

### Count V – The Matthews/Criminal Matter

In 2011, Mystar Matthews contacted respondent to assist him in the handling of legal work to purchase property in Baton Rouge. Respondent advised Mr. Matthews to allow Satellite Realty to handle the sale. At that time, the directors of Satellite Realty were listed with the Secretary of State as respondent and her

9

husband, Leonard Robinson. This information was not initially disclosed to Mr. Matthews. Respondent presented her husband as a realtor. Thereafter, she informed Mr. Matthews that her husband could not assist them as the realtor and that she would handle the sale herself. Respondent also advised Mr. Matthews that the loan would be taken on by Nationstar Mortgage and could be closed in July 2011. Although Mr. Matthews repeatedly maintained that he did not need a loan and was paying in cash, respondent insisted that he sign the HUD-1 settlement statement.

The settlement statement was also purportedly executed by Ivory Pennington. Ms. Pennington told investigators at the East Baton Rouge Sheriff's Office ("EBRSO") that she did not sign the document and that her signature was cut and pasted from another real estate transaction. Furthermore, Ms. Pennington did not have the authority to sell the property, which she co-owned with her deceased husband, Isaac Smith. Thus, a succession was required before the sale could be completed. This was not disclosed to Mr. Matthews.

Unbeknownst to Mr. Matthews, respondent completed the legal work for the Isaac Smith succession. At the closing, respondent attempted to compel Mr. Matthews to pay legal fees for the succession. She advised that the transaction would be a short sale and that Mr. Matthews would have to show proof of funds and deposit $34,000 with her, which he did. Respondent said the funds would be placed into her client trust account. Respondent later admitted that she did not have a client trust account.

The property was not transferred to Mr. Matthews and the $34,000 was never returned. As a result, Mr. Matthews incurred additional costs, loss of income, and additional legal expenses. Mr. Matthews lodged a complaint with the EBRSO. In June 2012, respondent was arrested and booked with felony theft and forgery. After failing to appear before the court for trial on numerous occasions, she pleaded guilty to felony theft on May 19, 2015.

10

The ODC alleged respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.2 (a lawyer shall abide by a client's decisions concerning the objectives of the representation and shall consult with the client as to the means by which they are to be pursued), 1.5 (charging an unreasonable fee; the scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client), 1.7, 1.8, 1.15 (safekeeping property of clients and third persons; failure to maintain a client trust account), 3.4(c), 8.4(a), 8.4(b) (commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer), 8.4(c), and 8.4(d).

After considering the testimony and evidence presented at the hearing, the hearing committee made the following findings:

Mr. Matthews was told about the house by Jerri Wells, who worked part-time for respondent's mortgage company. He understood that Ms. Pennington and someone named Smith were the owners of the house. Mr. Matthews testified that he gave respondent two cashier's checks totaling $34,000, and of that amount, $27,219 was for the sale of the house and $6,781 was for a succession on the property. The checks were made out to "Peggy M. H. Robinson A Professional Law Firm." When Mr. Matthews did not get the house or a refund, he made a criminal complaint.

The EBRSO conducted an investigation. Ms. Pennington told the investigator that she was unaware that the house was being sold. Ms. Wells told the investigator that her signature on the purchase agreement was forged. Respondent was arrested and charged with felony theft and forgery.

In May 2015, respondent entered a "best interest" plea to theft over $1,500, a felony. Judge Michael Erwin of the 19th JDC sentenced respondent to one year of

probation on the condition she pay $34,000 in restitution to Mr. Matthews. The restitution has not yet been paid.

Assistant District Attorney David DeBlieux testified that in exchange for her plea, the Semar case (Count VI) and the Moore case (Count VII), both involving theft greater than $1,500, were dismissed. He also testified that respondent deposited Mr. Matthews' checks into a personal account listed in the names of her and her husband. The withdrawals from the account were for personal expenses.

Respondent testified that she agreed to pay restitution to Mr. Matthews on the basis that the district attorney would not file disciplinary charges against her. She admitted that she did not pay the money after the district attorney broke his promise, but testified that she was trying to get the money "this week." She testified she did not have an attorney-client relationship with Mr. Matthews, but admitted that he paid her to do succession work, for which she collected $6,780. Respondent offered no proof that a succession was completed. Respondent testified that she knew nothing about the house because Ms. Wells handled the matter out of her office. However, respondent collected money for a succession that was to include the house Mr. Matthews believed he was buying. Respondent was adamant that Mr. Matthews gave her money to give to Ms. Wells. Respondent testified that she did not plead guilty, but the hearing transcript is clear. Plus, she admitted that she used some of the money and had done wrong.

The committee credited the testimony of Mr. Matthews, but did not credit the testimony of respondent or of Ms. Wells, whose name is apparently on the purchase agreement. Ms. Wells claims it is a forgery, but respondent and Ms. Wells did all the paperwork. Ms. Pennington, whose testimony appeared credible, believed Ms. Wells had her "hand in it." She said the affidavit prepared by respondent is false.

Based on these findings, the committee determined respondent violated Rules 1.15, 8.4(a), 8.4(b), and 8.4(c) of the Rules of Professional Conduct.

12

*Count VI – The Semar/Roddy/Criminal Matter*

In June 2012, respondent handled a real estate closing for Semar Holdings, LLC ("Semar") as notary public/closing attorney. Semar had sold property in Baton Rouge to Lizzy Escort Roddy and Bertell Roddy for $32,000. Respondent received funds from the Roddys for the property but failed to deliver the funds to Semar. In July 2012, the Roddys' son, James Escort, reported the theft to the EBRSO.

Mr. Escort became acquainted with a man named Parry Donaldson on June 27, 2012, after noticing a "for sale" sign on the property. When Mr. Escort called the posted number, Mr. Donaldson answered and represented himself as a realtor who could assist in the purchase. Mr. Escort made a $2,000 down payment to Mr. Donaldson against the purchase price of $32,000.

The Roddys visited respondent's office, where she had the sale documents prepared. Mr. Donaldson and a woman named Doris Johnson were present and indicated they were agents of Semar, the company that was selling the property. The property was sold as a cash sale. Ms. Johnson signed as officer for Semar. The Roddys signed as buyers. Mr. Escort signed as a witness. Respondent signed as notary. Mr. Escort gave respondent a $27,325 cashier's check payable to "Peggy Robinson."

Respondent represented and the sale agreement stated that the property had no liens, but when Mr. Escort took the act of sale to the clerk of court to be recorded, he discovered two liens totaling $1,600. After paying the liens, Mr. Escort received a call from Mr. Donaldson requesting that he stop payment on the check and offering $500 to Mr. Escort if he wrote another check, payable to Parry Donaldson. Finding this suspicious, Mr. Escort contacted realtor companies to investigate Mr. Donaldson. Mr. Escort discovered that Mr. Donaldson was not a realtor. Mr. Escort let the funds remain with respondent.

The next day, Mr. Escort tried to take possession of the house, but Mr. Donaldson had left a sign on the door that read: "House have been sold Peggy don't own anything. Escorts call me #284-0054. Doris not authorized to sign." Mr. Escort contacted Mr. Donaldson who advised that Ms. Johnson was not authorized to sign and that the house did not belong to the purported buyers. Mr. Donaldson further advised that if Mr. Escort tried to enter the house he would be trespassing.

Mr. Escort called the EBRSO to ask if he could change the locks and take possession. He was advised to file a police report to ensure he was not part of a scam. The EBRSO questioned respondent about the money. She falsely advised that she represented Semar and Mr. Donaldson in other legal matters involving theft cases being handled by the Attorney General's Office. Respondent stated that she used the funds from the closing to pay restitution on behalf of Semar and Mr. Donaldson. Respondent accompanied Mr. Escort to the EBRSO for questioning, at which time she presented an act of correction, dated July 2, 2012, reflecting that the original act of sale incorrectly stated the sales price as $17,500.

The EBRSO contacted the Attorney General's office to learn that respondent made no payments for restitution on behalf of Semar or Mr. Donaldson. Respondent was only entitled to a $500 closing fee. On July 12, 2012, she was arrested and booked with felony theft and forgery. On May 19, 2015, the matter was dismissed pursuant to a plea deal in which respondent pleaded guilty to felony theft in an unrelated offense. Respondent had converted over $26,000 for her own use.

The ODC alleged respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.5, 1.7, 1.8, 1.15, 8.4(a), 8.4(b), and 8.4(c).

After considering the testimony and evidence presented at the hearing, the hearing committee made the following findings:

14

Respondent collected $32,000 and admitted that she never gave the money to Semar. She testified that the Roddys got the house and that she was the closing attorney. She admitted that after ethical and criminal complaints were filed against her, she sued Semar. She claimed to have an agreement with Cecil Harleaux, Jr., the owner of Semar, to allow Mr. Donaldson to be his agent and represent him in a monthly retainer agreement. She later testified that there was no agreement. Respondent stated after paying herself $18,000 from the proceeds, the remaining money was to pay victims of Mr. Donaldson and Semar related to an Attorney General investigation. She admitted that $18,000 was not an agreed amount, but claimed that Semar owed her more than that for her prior work.

Mr. Harleaux testified that he authorized Mr. Donaldson to assist him in selling the property, but adamantly denied authorizing him to sign a retainer agreement with respondent. He testified that she deposited the sale proceeds and did not disburse any funds to him or to Semar. He testified that he did not authorize her to pay third parties any money from the proceeds, noting that he was unaware of her giving money to the United States Department of Justice. He recalled getting a document from the Attorney General's Office, but he did not respond. He testified that Mr. Donaldson was not given permission to negotiate with the Attorney General's Office regarding any complaints because there were none.

Mr. Donaldson testified that he signed the retainer agreement between Semar and respondent, but did not sign as an agent for Semar. He testified that a statement under his signature indicating that he was signing for Semar was not something he wrote or authorized. Apparently, someone else wrote in a different handwriting in different ink under his signature the statement "for Semar Holdings, LLC." The committee found this troubling.

Randal Brinkhuis of the Attorney General's Office testified that he worked a case involving Mr. Donaldson. Respondent told Mr. Brinkhuis that Mr. Donaldson

15

and Semar were likely running a Ponzi scheme, which Mr. Brinkhuis had "already figured" out, but respondent was vague on whether she represented Semar and Mr. Donaldson. Respondent also told Mr. Brinkhuis that she handled a real estate transaction and from the money, paid herself and some bills for Mr. Donaldson. Respondent was not a target of Mr. Brinkhuis' investigation and his office never entered into any kind of settlement or resolution with her.

Detective Luckett of the EBRSO testified that the Roddys gave respondent $29,000 but never got the house. Respondent told him that she used the sale proceeds to pay the Attorney General for amounts owed by Mr. Donaldson and admitted that some funds went into her bank account. Detective Luckett testified that he contacted the Attorney General's Office and confirmed that no payments were made on Mr. Donaldson's behalf. This testimony is corroborated by exhibits.

Based on these findings, the committee determined respondent violated Rules 1.15 and 8.4(b) of the Rules of Professional Conduct.

*Count VII – The Moore/Criminal Matter*

In November 2011, Timothy Moore and Brandon Walker saw a house in Baton Rouge for sale by owner. They called the posted telephone number, which belonged to Parry Donaldson (Count VI). They went to his office and signed documents. Mr. Moore issued a personal check to Mr. Donaldson in the amount of $1,000 to be used towards closing fees and a second check in the amount of $87 for administrative fees. In December 2011, Mr. Donaldson contacted Mr. Moore about purchasing a second property. Mr. Donaldson advised that he did not need another deposit, and would take $500 from the first transaction and apply it to the second property. In January 2012, Mr. Donaldson contacted Mr. Moore about purchasing a third property, which was being occupied by renters. Mr. Moore and Mr. Walker paid Mr. Donaldson another $487 and executed an offer to purchase all three properties.

On March 12, 2012, Mr. Moore and Mr. Walker met respondent at her office where she had prepared three sets of the following documents: Sale with Mortgage, Note, and Settlement Statement HUD-1. She advised that Mr. Donaldson, who was not present, wanted to short sale the properties and owner finance the balances. She also requested $6,000 for the closing. Mr. Moore denied her request, believing the money he previously paid to Mr. Donaldson was to be used towards the closing. Mr. Moore and Mr. Walker left respondent's office without signing the documents.

Respondent advised that after speaking with Mr. Donaldson, they agreed to apply the previously paid money towards the closing on the third property, which was ready to sell. On March 29, 2012, Mr. Moore returned to respondent's office to complete the closing and sign the papers for the third property. Respondent notarized the papers but never recorded the closing documents with the clerk of court.

On April 21, 2012, Mr. Moore and Mr. Walker met with respondent to get the keys to the third property and to give her a check for $1,086.50, which she had requested. Respondent became angry for not being paid in "cash." Mr. Moore explained that he wanted a paper trail for all transactions as the properties were to be used as rentals. Respondent tendered the original unfiled paperwork, a copy of an agreement between Mr. Donaldson and Semar with the property's true owner, Ms. Josea Keller, and a bill from a document preparer. Respondent gave Mr. Moore the keys, went immediately to the bank, and negotiated the check.

Mr. Moore and Mr. Walker proceeded to the third property, where a woman occupying the property advised that she, too, was purchasing the property from Mr. Donaldson. Mr. Moore then went to the clerk of court's office, where he discovered that the property was in foreclosure and had been seized by the EBRSO on January 27, 2012. Mr. Moore also learned that Ms. Keller had inherited the property from her father, the original owner. Apparently, Mr. Donaldson had contacted Ms. Keller

17

and entered into an agreement with her to lease the property for $750. Under the agreement, Mr. Donaldson was to pay the mortgage note with those funds and/or sell the property for $110,000 by November 14, 2013. Ms. Keller lost the property to foreclosure because Mr. Donaldson failed to pay the mortgage.

Mr. Moore and Mr. Walker confronted both Mr. Donaldson and respondent. Mr. Donaldson promised to refund the money, but never did. Respondent refused to provide a refund or a title to the property. She also repeatedly attempted to get Mr. Moore and Mr. Walker to close on the other two properties, but refused to provide title insurance or keys at the time of closing. Mr. Moore and Mr. Walker declined to close on the remaining properties.

In June 2012, the EBRSO obtained an arrest warrant for respondent and she was arrested thereafter. On May 19, 2015, the matter was dismissed pursuant to a plea deal in which respondent pleaded guilty to felony theft in an unrelated offense.

The ODC alleged respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.5, 1.7, 1.8, 1.15, 8.4(a), 8.4(b), and 8.4(c).

After considering the testimony and evidence presented at the hearing, the hearing committee made the following findings:

Detective Corporal Jessica Pizzolato testified that Mr. Moore was defrauded by Mr. Donaldson and respondent in the transaction. Detective Pizzolato testified that the conduct was illegal because a person purchased what they believed to be available property and lost their money. Detective Pizzolato stated simply that the buyer's "money is gone and he has no property. That's a theft."

Respondent testified that she disclosed to Mr. Moore that Semar was an active client in her engagement letter and claimed that she had disclosed that she was representing two existing clients against one another; however, she produced no

18

engagement letter or corroboration of her statement and no evidence that a waiver was signed by all parties to the transaction.

Based on these findings, the committee determined respondent violated Rules 1.7(a), 8.4(a), and 8.4(b) of the Rules of Professional Conduct.

*Count VIII – The Unauthorized Practice of Law Matter*

Respondent is not licensed to practice law in North Carolina, the United States District Court for the Middle District of North Carolina, or the United States Fourth Circuit Court of Appeals.

In September 2007, respondent filed a complaint in the United States District Court for the Middle District of North Carolina on behalf of her mother's estate. The defendants filed motions to dismiss. Thereafter, respondent filed a series of unauthorized motions. In June 2008, the court entered an order requiring respondent to retain an attorney who was licensed to practice law before that court to appear on behalf of the estate. When respondent failed to obey the order, the matter was dismissed.

Respondent filed a second complaint in the United States District Court for the Middle District of North Carolina arising out of a family dispute over immovable property in North Carolina. The court advised respondent to retain local counsel, but she continued to file unauthorized pleadings. In January 2006, the court again advised respondent that she must retain local counsel. In September 2006, respondent filed a motion for appointment of counsel. The motion was denied and the matter was dismissed.

Respondent appealed the dismissal of both lawsuits to the United States Fourth Circuit Court of Appeals. The decisions were affirmed on appeal.

The ODC alleged respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 3.1, 3.4(c), and 8.4(a).

19

After considering the testimony and evidence presented at the hearing, the hearing committee made the following findings:

Respondent admitted in her testimony that she was not licensed to practice law in North Carolina. The court in North Carolina ordered respondent to have an attorney admitted in that court enroll in the matter to avoid dismissal. Respondent did not do so, and ultimately the lawsuits were dismissed.

The court orders do not reflect any substantive information in the pleadings that were filed. Respondent, as a party to a lawsuit, was advised that the suit would be dismissed if she did not enroll a licensed attorney to practice in this particular court. A party to litigation is free to allow the suit to be dismissed. She did not violate any court order such that she was sanctioned for failure to enroll a lawyer.

Based on these findings, the committee determined that this charge was not proven by clear and convincing evidence.

*Count IX – The Scott Matter*

The following facts are not in dispute, having been stipulated to by the parties.

Ronald Scott hired respondent to open a succession. Mr. Scott was referred to respondent by Kenneth Bradford, a fellow inmate at the correctional facility where Mr. Scott was incarcerated. Respondent, who was also representing Mr. Bradford, went to the correctional facility to meet with Mr. Scott. At this time, he executed and signed certain documents for the succession. On April 20, 2006, a quitclaim deed purportedly signed by Mr. Scott, his brother Olanda Scott, Garrett Brown, and two unidentified witnesses was notarized and recorded by respondent. On July 20, 2006, an amended and corrected quitclaim deed purportedly signed by the same signatories was notarized and recorded by respondent.

The ODC alleged respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.2, 1.4 (failure to communicate with a client), 1.5, 1.7, 1.8, 1.15, 8.4(a), 8.4(b), and 8.4(c).

After considering the testimony and evidence presented at the hearing, the hearing committee made the following findings:

Respondent testified that she drafted and notarized the quitclaim deed in question. The deed shows that Ronald Scott and his brother Olanda (through Ronald as mandatary) appeared and deeded their deceased mother's house to Garrett Brown. A power of attorney in favor of Ronald was signed on the same date as the deed.

Ronald claimed that respondent was hired to handle a succession at a time when he was incarcerated. He claimed Olanda had signed a renunciation and a power of attorney so he (Ronald) could handle everything. Ronald claimed that he never signed the quitclaim deed and did not know about the property being sold to Mr. Brown. Ronald also claimed that signatures on the deed were forged by lifting the signatures from the succession.

Olanda testified that he never renounced his interest and had no intention to sell the property. Olanda testified that he did not sign the document granting power of attorney to Ronald to sell the property, but only gave Ronald permission to sign his name to file a disciplinary complaint. When shown the power of attorney to enter the quitclaim deed, Olanda testified that it was not the document he signed.

Mr. Brown testified that he signed the quitclaim deed and that the brothers were never at the jail with him to sign any papers. Mr. Brown stated that Mr. Bradford and Ronald were trying to form a corporation. Through their "arrangement," Mr. Brown took possession of the property via the quitclaim deed. Mr. Brown paid nothing for the property, which he ultimately lost in foreclosure.

The testimony of some witnesses was inconsistent. Ronald initially claimed that he received $2,000 from the sale; yet, he later testified that he received no

money. It is unclear whether Olanda granted Ronald power of attorney. Ronald testified that it was not his intention to give up the house, but Mr. Brown testified that Ronald coordinated with another inmate for the house to be put into Mr. Brown's name. The testimony of Ronald and Olanda makes clear that they did not understand what was going on. Respondent did not perform adequate due diligence. It appears that she represented two brothers whose interest was not aligned. It is questionable that she notarized both signatures with all people present on the two transactions. If all had been available together, Ronald would not have needed a power of attorney from Olanda to perform the transaction.

Based on these findings, the committee determined respondent violated Rules 1.2(a), 1.4(a), 1.7(a), and 8.4(d) of the Rules of Professional Conduct.

*Count X – The Borne Matter*

The following facts are not in dispute, having been stipulated to by the parties:

In July 2010, respondent filed a suit on behalf of Beverly Borne in the United States District Court for the Eastern District of Louisiana. The defendant was not served within 120 days pursuant to the Federal Rules of Civil Procedure. The court issued two show cause orders regarding the lack of service. A summons was never issued and the case was dismissed in March 2011. Respondent appealed the decision on behalf of Ms. Borne. The decision was affirmed on May 14, 2013.

The ODC alleged respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.3, 1.4, 8.4(a), and 8.4(c).

After considering the testimony and evidence presented at the hearing, the hearing committee made the following findings:

Respondent claimed that she represented Ms. Borne diligently and timely; however, the defendant was not timely served and the suit was dismissed. Respondent denied owing a balance to the court, which is why the suit was not

22

served.  On October 13, 2010, the court ordered respondent to appear in person to show why service was not completed. There was no evidence to show that she appeared or requested a summons.

Ms. Borne testified that she did not know the lawsuit had been dismissed as respondent did not inform her of the decision.  According to Ms. Borne, respondent had known since June or July that her suit had been dismissed but she did not find this out from respondent until October.  Ms. Borne testified that every document she received from respondent came after two or three requests for same.

After the dismissal, Ms. Borne questioned what respondent planned to do about the dismissal of her case.  In the latter part of 2014, respondent advised Ms. Borne that she had professional liability insurance with Gilsbar.  Ms. Borne later learned from Gilsbar that respondent was notified in February 2014 that she had no insurance.  The committee credited the testimony of Ms. Borne.

Based on these findings, the committee determined respondent violated Rules 1.3, 1.4(a), and 8.4(c) of the Rules of Professional Conduct.

*Count XI – The Vanner Matter*

In 2006, Jake Vanner retained respondent to handle nine debt collection files, paying her a $1,000 advance deposit.  Respondent performed no work in the matter. In 2010, Mr. Vanner requested the return of his files.  However, respondent had transferred the matter to Emmett Spooner, a self-proclaimed paralegal, investigator, and friend to respondent and Mr. Vanner.  Mr. Vanner indicated that he never authorized respondent to give his files to Mr. Spooner, who lost the files.  Mr. Vanner was given the "run around" for two years before he filed a disciplinary complaint in September 2012.  Respondent assisted Mr. Spooner in the unauthorized practice of law, failed to return files to Mr. Vanner, and failed to return the $1,000 unearned fee.

The ODC alleged respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.2, 1.3, 1.4, 1.5, 1.15, 5.4(a) (a lawyer shall not share legal fees with a nonlawyer), 8.4(a), and 8.4(c).

After considering the testimony and evidence presented at the hearing, the hearing committee made the following findings:

Respondent testified that she got the files from Mr. Vanner and copied and returned them to him. Mr. Vanner testified that respondent never returned his files and that he understood she had given them to Mr. Spooner, who did not know where the files were because he had moved. Mr. Spooner testified that it was "a possibility" he lost the files. The committee credited the testimony of Mr. Vanner. His collection work did not get done, and he did not get his files.

Based on these findings, the committee determined respondent violated Rule 1.2 of the Rules of Professional Conduct "to the extent it incorporates Rule 1.4."

*Count XII – The Howard Matter*

Respondent notarized a donation inter vivos purportedly signed by Joann Howard on May 19, 2000. On that day, Ms. Howard was a full-time graduate student living in Michigan. In 2011, while researching public records on property she had purchased, Ms. Howard discovered the document, bearing what purported to be her signature. Ms. Howard never signed or executed the document and never met respondent. Ms. Howard stated that the only documents she executed were the ones generated for a succession and a cash sale. These documents were sent to her via FedEx by respondent and were executed and notarized in Michigan.

The ODC alleged respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 8.4(a), 8.4(b), and 8.4(c).

After considering the testimony and evidence presented at the hearing, the hearing committee made the following findings:

This count relates to a claim by Ms. Howard that her name was forged on a donation inter vivos. The act of donation purportedly transferred all of her interest in immovable property to Ronald Hickerson, Sr., who had been married to Ms. Howard's mother at the time of her death.

Respondent testified that Mr. Hickerson hired her to handle the succession of his wife. A May 1, 2000 judgment placed Ms. Howard and Nicole Howard (adult children of the decedent) and two minor children (children of the decedent and Mr. Hickerson) in possession of the property. Then, on May 9, 2000, respondent drafted and notarized a document whereby Mr. Hickerson sold the property interest of the minors to Ms. Howard for $10. Respondent testified: "My clients told me what they wanted me to do." She "checked out the legal side of it" and it seemed feasible to her. A donation inter vivos was then prepared and notarized by respondent on May 19, 2000, for Ms. Howard to donate her interest to Mr. Hickerson, individually. After the purported donation, respondent filed a motion for authorization to mortgage the minors' interest in the same property purportedly donated and sold to Mr. Hickerson.

Respondent and Ms. Howard both testified that for the sale of the minors' interest, respondent sent Ms. Howard a document to be signed, notarized, and returned. Respondent claimed that after she had sent the documents to Ms. Howard, she spoke with Ms. Howard, who advised that she would be in Baton Rouge for the weekend and would sign the documents at respondent's office. According to respondent, a lady came to her office on May 19, 2000, and presented identification bearing the name of Ms. Howard. To the best of respondent's recollection, Mr. Hickerson brought the parties to her office for signing. Ms. Howard disputed this version of events. Moreover, records indicate that this document was notarized in Michigan. Ms. Howard testified that the signature on the document was a forgery.

Mr. Hickerson stated that he thought Ms. Howard was transferring her interest to the minor children, although he never saw the sale document. Mr. Hickerson testified that he and Ms. Howard signed the document at different times. In discussing the work respondent did for him, he stated: "In dealing with - - I swear to God, I would never do it again. And doing certain things I did, you know - - it it was just - - just brought me through a turmoil. So, hey, let's - - whatever it takes to ease my mind."

Linda Chriss, respondent's employee and a purported witness to the signatures of Ms. Howard and Mr. Hickerson to the donation, testified that it was standard practice to rely on the presentation of an identification card and that people were required to sign in respondent's presence. Ms. Chriss testified that the witness signature on the document was not her own. (In response to the complaint, respondent stated that Ms. Chriss was honest and trustworthy in her employment.)

Mary Ann Sherry, an expert witness in handwriting and signatures, testified that Ms. Howard's purported signature on the donation was not authentic. She explained that there were many differences between the donation signature and the fifteen signatures of Ms. Howard's that she had obtained and examined.

The committee noted that if Mr. Hickerson had brought all the parties to respondent's office, as respondent had claimed, and one of them said she was Ms. Howard, Mr. Hickerson, who had been married to her mother, would have known her identity. The committee was troubled by the three-transaction arrangement which purportedly took property from two minors, transferred it to Ms. Howard, who then transferred it to the father of the minors, all within a couple of weeks. On the day of the donation, Mr. Hickerson, who was now sole owner, was able to get a $66,000 loan against the house. Later, he sold the house but received no proceeds from the sale. By the time he paid off the mortgage and paid fees, nothing was left.

Mr. Hickerson stated that he hired respondent to do the succession because he needed money to fix up the house. He made her aware of this.

The committee credited the testimony of Linda Chriss and Joann Howard. Respondent, who was the lawyer in all transactions, notarized a document when she should have known that Ms. Chriss had not witnessed it. Had all parties gone to her office together, as respondent had recalled, Mr. Hickerson, who knew Ms. Howard as his deceased wife's daughter, would have known Ms. Howard on sight. The parties' signatures are purportedly witnessed and notarized separately, so the donor and donee could have been present at different times. Respondent indicated that her answer to the complaint was based on her recall of an event that happened long before. Accordingly, the committee could not find it clear and convincing that she knew the lady signing as Ms. Howard was someone else.

Based on these findings, the committee determined respondent violated Rule 8.4(c) of the Rules of Professional Conduct.

*Count XIII – The DiVittorio Matter*

Frank DiVittorio was respondent's opposing counsel in *Roba, Inc. v. James B. Courtney and Mona Lockman Courtney, et al.*, No. 160,80 on the docket of the 21st JDC for the Parish of St. Helena. During a hearing, while respondent was present, Emmett Spooner (Count XI) attempted to address the court directly on behalf of Roba, Inc. Following Mr. DiVittorio's objection to Mr. Spooner's attempt to practice law, the court asked Mr. Spooner if he was an attorney. In response, Mr. Spooner stated that he is not an "attorney," placing "air quotes" on the word attorney. Mr. Spooner has been criminally prosecuted in the past for engaging in the unauthorized practice of law.

The ODC alleged respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.3, 3.1, 3.4(c), 8.4(a), and 8.4(d).

After considering the testimony and evidence presented at the hearing, the hearing committee made the following findings:

Attorney DiVittorio notified the ODC that Mr. Spooner was appearing before the court and making an argument. He was also concerned that respondent seemed unfamiliar with the case and that Mr. Spooner was "in her ear" at the hearing. Respondent testified that the judge asked Mr. Spooner a question about his research. Mr. Spooner stood up and began to address the court and the judge stopped him. There was no evidence that respondent initiated Mr. Spooner's actions, or that she suggested or participated in his addressing the court.

Based on these findings, the committee determined that this charge was not proven by clear and convincing evidence.

*Count XIV – The West Matter*

The following facts are not in dispute, having been stipulated to by the parties.

Gary Lathers retained respondent to handle the succession of his mother, Patricia West. Mr. Lathers paid respondent $2,000 for attorney's fees and $474 for filing fees and court costs. The estate owned an annuity quoted to be worth $900,000. Mr. Lathers was informed that attorney's fees for the succession would be $27,000. In 2014, respondent requested payment of $33,956 in attorney's fees from the court, but the judge rejected her request.

On March 11, 2015, respondent was suspended from the practice of law on an interim basis. On May 25, 2015, she filed three pleadings in the succession matter, including a judgment of possession. The judge refused to sign any of the proposed orders or judgments because respondent was not authorized to practice law.

The ODC alleged respondent's conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.5 and 5.5 (engaging in the unauthorized practice of law).

28

After considering the testimony and evidence presented at the hearing, the hearing committee made the following findings:

In May 2015, two months after her interim suspension was effective, respondent brought a pleading to the 19th JDC, had it filed, and brought it to the civil division. Respondent's signature on the pleading was dated November 22, 2014. Rose Christian of the 19th JDC testified that respondent brought the papers herself for filing and asked when the judge might sign them. The clerk's office did not know. Respondent called back at a later date, at which time Ms. Christian told respondent that the judge denied the order and wrote on the order that the attorney was disbarred. According to the affidavit of Tiara Barnes of the 19th JDC, respondent then stated that she would "get another judge."

Respondent did not disclose to Mr. Lathers that she had been suspended. Following her suspension, she continued to negotiate fees with him and his wife, Nneka Goins, although the court had set a maximum fee for the succession at $7,500.

Respondent testified that the succession work was completed in December 2014. When asked why she did not file the pleadings at that time, respondent indicated that she had not been feeling well. On the day she filed the papers in May 2015, she just decided to go down to the courthouse and file. She did this for therapeutic reasons, as her husband thought it would make her feel better.

Based on these findings, the committee determined respondent violated Rules 1.5 and 5.5 of the Rules of Professional Conduct.

## DISCIPLINARY PROCEEDINGS

### *Formal Hearing*

As previously stated, this matter proceeded to a formal hearing on the merits. Both respondent and the ODC introduced documentary evidence. In addition, numerous witnesses testified in person before the committee.

Respondent complained that due to the age of some of these matters, they are prescribed.[2] The committee disagreed. Her conduct was not merely negligent, and even if it were, the pattern of repeated negligent behavior rises to the level of recklessness or indifference, if not intent. Thus, none of the charges should be dismissed on the basis of prescription. The committee only questioned why the ODC waited so long to bring some of the charges since some of the violations and losses to the victims might have been avoided.

Respondent spent most of the seven-day hearing attempting to re-litigate the underlying matters that precipitated the formal charges. She offered little or no evidence to show that the charges were not well-founded. Her testimony was not reliable and she offered no corroboration of her testimony. She was ordered by several tribunals to pay sanctions or some form of refund/restitution, none of which she has paid. The victims testified that they were not refunded any money and many testified to the harm respondent had caused them.

In mitigation, the committee found the absence of a prior disciplinary record. In aggravation, the committee found a pattern of misconduct and illegal conduct (felony conviction involving dishonesty), and a lack of remorse. Although the ODC had stipulated to respondent's cooperative attitude, the committee found she was argumentative and accusatory at the hearing.

---

[2] Supreme Court Rule XIX, § 31 provides that "[a] disciplinary complaint, or the initiation of a disciplinary investigation with regard to allegations of attorney misconduct, where the mental element is merely negligence, shall be subject to a prescriptive period of ten years from the date of the alleged offense." For this liberative prescriptive period to apply, two elements must be established: (1) the disciplinary complaint or investigation must be instituted within ten years of the underlying conduct, and (2) the lawyer must have acted negligently. *See In re: Stanford*, 10-1547 (La. 12/17/10), 50 So. 3d 151.

The committee recognized that grounds for permanent disbarment may exist in this case, but based on the prior jurisprudence of the court, the committee recommended disbarment.[3]

Both respondent and the ODC filed objections to the hearing committee's report.

*Disciplinary Board Recommendation*

As a preliminary matter, the disciplinary board agreed that the formal charges against respondent are not prescribed. In only one of the fourteen counts was the complaint or investigation initiated more than ten years after the underlying conduct. Specifically, in Count XII (the Howard matter), the complaint was filed and the investigation was initiated in 2012 concerning conduct that occurred in 2000. However, the board agreed with the hearing committee that respondent's conduct was not negligent and, at the very least, rose to the level of recklessness or indifference, if not intent. Accordingly, the liberative prescription of Supreme Court Rule XIX, § 31 does not apply.

As to the committee's factual findings, the board found they are supported by the record and are not manifestly erroneous. The board therefore adopted the findings. Based on these facts, the board determined that respondent violated Rules 1.2, 1.3, 1.4, 1.7, 1.15, 3.1, 3.4, 5.5, 8.4(a), 8.4(b), 8.4(c), and 8.4(d) of the Rules of Professional Conduct.

Respondent violated duties owed to her clients, the public, the legal system and the legal profession. Her conduct was knowing, if not intentional. Respondent caused actual harm to her clients and others by converting their funds and refusing to make restitution. Respondent caused harm to the public and to the legal profession

---

[3] One committee member submitted a dissent for Count XII (the Howard matter), noting that respondent's role in the crime is uncertain, as she could have easily been duped and used in the transaction.

by engaging in criminal conduct. By initiating frivolous litigation, filing repetitive pleadings, ignoring court orders and engaging in the unauthorized practice of law, respondent caused harm to the legal system and the legal profession. After considering the ABA's *Standards for Imposing Lawyer Sanctions*, the board determined that the baseline sanction is disbarment. The board adopted the aggravating and mitigating factors found by the committee.

Considering the numerous counts of misconduct, including respondent's guilty plea to theft, her conversion of client funds, and her refusal to make restitution or otherwise make payment as ordered in multiple matters, the board found permanent disbarment is appropriate. Respondent has caused significant monetary harm to several individuals, as described in Guideline 1 of the permanent disbarment guidelines. Moreover, she has demonstrated a lack of respect for the courts and tribunals of this state, including the Louisiana Supreme Court, by ignoring the orders issued by those courts. She knowingly continued to practice law after the issuance of the Supreme Court's order of interim suspension, as described in Guideline 8.

Under the circumstances, the board recommended respondent be permanently disbarred. The board also recommended that respondent be assessed with the costs and expenses of this proceeding.

Respondent filed an objection to the disciplinary board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b). Respondent filed two motions to continue oral argument, which we denied. Thereafter, she did not appear for oral argument.

## DISCUSSION

Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has

been proven by clear and convincing evidence. *In re: Banks*, 09-1212 (La. 10/2/09), 18 So. 3d 57. While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. *See In re: Caulfield*, 96-1401 (La. 11/25/96), 683 So.2d 714; *In re: Pardue*, 93-2865 (La. 3/11/94), 633 So.2d 150.

The record in this matter supports a finding that respondent neglected legal matters, engaged in conflicts of interest, engaged in the unauthorized practice of law, failed to make refunds or pay sanctions as ordered by a court of law, was arrested and charged with three felony thefts, and pleaded guilty to one felony theft. For the reasons expressed by the hearing committee and the disciplinary board, this misconduct is not prescribed. Respondent's conduct violated Rules 1.2, 1.3, 1.4, 1.7, 1.15, 3.1, 3.4, 5.5, 8.4(a), 8.4(b), 8.4(c), and 8.4(d) of the Rules of Professional Conduct.

Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent's actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. *Louisiana State Bar Ass'n v. Reis*, 513 So. 2d 1173 (La. 1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. *Louisiana State Bar Ass'n v. Whittington*, 459 So. 2d 520 (La. 1984).

Respondent violated duties owed to her clients, the public, the legal system, and the legal profession. Her conduct was knowing, if not intentional. She caused actual harm to her clients and others by converting their funds and refusing to make restitution. She caused harm to the public and to the legal profession by engaging

in criminal conduct. She caused harm to the legal system and the legal profession by initiating frivolous litigation, filing repetitive pleadings, ignoring court orders, and engaging in the unauthorized practice of law. The baseline sanction is disbarment.

The disciplinary board concluded that respondent's conduct is so egregious that she should be permanently disbarred. We agree. She engaged in multiple instances of intentional conversion of client funds with substantial harm, as required by Guideline 1 of the permanent disbarment guidelines. Moreover, she filed pleadings in court after being placed on interim suspension, conduct that falls under Guideline 8 of the permanent disbarment guidelines (following notice, engaging in the unauthorized practice of law subsequent to resigning from the Bar Association, or during the period of time in which the lawyer is suspended from the practice of law or disbarred).

Respondent's conduct demonstrates a disregard for her clients and for her duties as an attorney. In order to protect the public and maintain the high standards of the legal profession in this state, we find respondent should not be allowed the opportunity to return to the practice of law in the future.

Accordingly, we will adopt the board's recommendation and permanently disbar respondent. We will also order respondent to make restitution to her former clients or the Client Assistance Fund, as appropriate.

**DECREE**

Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Peggy M. Hairston Robinson, Louisiana Bar Roll number 1132, be and she hereby is permanently disbarred. Her name shall be stricken from the roll of attorneys and her license to practice law in the State of Louisiana shall be revoked.

Pursuant to Supreme Court Rule XIX, § 24(A), it is further ordered that respondent be permanently prohibited from being readmitted to the practice of law in this state. It is further ordered that respondent make full restitution to each of her clients subject of the formal charges, or to the Louisiana State Bar Association's Client Assistance Fund, as applicable. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.